**Robert E. PINE, Appellant,**

v.

**GIBRALTAR SAVINGS ASSOCIATION, Appellee.**

**No. 16383.**

Court of Civil Appeals of Texas, Houston (1st Dist.).

Dec. 12, 1974.

Rehearing Denied Jan. 16, 1975.

---

ment shown on the inventory to the owner thereof."

Harry S. Jones, Robert H. Zoda, Jr., Bellaire, for appellant.

Kronzer, Abraham & Watkins, Robert E. Ballard, W. James Kronzer, Monteith, Baring & Nester, Charles A. Nester, Houston, for appellee.

PEDEN, Justice.

Gibraltar Savings Association sued Robert E. Pine to recover a deficiency judgment after foreclosure of three deed of trust liens securing promissory notes executed in favor of Gibraltar by Mr. Pine. Mr. Pine filed a cross-action against Gibraltar for conversion of his water and sewer lines and for a breach of contract alleging damages in the amount of $450,000. Each party sought a summary judgment. After the first hearing, Gibraltar obtained a summary judgment as to the deficiency and a summary judgment denying Pine recovery on his cross-action. On appeal this court approved the granting of the summary judgment in favor of Gibraltar as to recovery of the deficiency and it

has remained in effect as an interlocutory order; we reversed and remanded the summary judgment that Pine take nothing on his cross-action. Pine v. Gibraltar Savings Association, 427 S.W.2d 714 (Tex. Civ.App.1968, no writ). On remand the parties were realigned with Pine as the plaintiff, and, in a non-jury trial, the trial judge granted Gibraltar's motion for judgment when Pine rested his case. This appeal is from that take-nothing judgment.

Mr. Pine was the developer of Glenwood Bayou Subdivision in Brazoria County. He obtained three loans from Gibraltar to improve and develop his property. As security for them he executed three deeds of trust encompassing much of the property located in the subdivision. When Gibraltar foreclosed the three deed of trust liens it took over and operated the water and sewer systems, including the pipes, until it sold the water system to Community Utilities, Inc.

Pine contends that the water and sewer pipes were never subject to any lien, that they were never dedicated to public use and that he intended to maintain them as his own private utility systems when Gibralter foreclosed on the deeds of trust. In Pine's first three points of error he contends that the trial court erred in granting the take-nothing judgment as to his allegations of conversion because there was probative evidence that Gibraltar received no title to the lines, that Pine was the sole owner and that the lines did not become part of the realty.

The water plant and sewer treatment plant were placed on separate sites known as Reserve Tract G and Reserve Tract H, respectively. Both tracts were included in the security in both the $87,000 deed of trust and the $217,655 deed of trust. The $87,000 loan was secured partially by ". . . the 'Reserve' Section of the Glenwood Subdivision . . . according to the recorded map or plat thereof attached to Deed recorded in Volume 719 at page 195 of the Deed Records of Brazoria

County, Texas." This is stipulated to be all property marked "Reserved" on plaintiff's exhibit 23. Plaintiff's exhibit 24 shows that Reserve Tracts G and H, part of the security for the $217,655 loan, were carved out of the large reserve area shown in plaintiff's exhibit 23. Therefore, these tracts were security for both the $87,000 and $217,655 loans.

The deeds of trust created a security interest in the described property "together with all improvements thereon, or hereafter to be placed thereon and all and singular the rights and appurtenances to the same belonging or in anywise incident or appertaining . . ." One question is whether the water and sewer lines were included in the property listed as security for the loans.

The $87,000 deed of trust included the following provision:

"The indebtedness evidenced by said $87,000 note represents acquisition costs of the property hereby conveyed in trust, and with regard to the development and improvement thereby, [Pine] covenants with [Gibraltar] as follows:

"(a) that the streets in the subdivision will be paved in accordance with plans and specifications for that purpose, it being understood that curbs and gutters will be installed.

"(b) that storm and sanitary sewers will be installed in the Subdivision in accordance with plans and specifications.

"(c) that water, gas and electricity shall be made available to each lot site. " . . . ."

The $217,655 deed of trust contained the following provision:

"This loan is made under the Rules and Regulations for the Federal Savings and Loan System, together with the amendments thereto, being a loan to finance the purchase and improvement of developed buildings lots and sites, and

[Pine] covenants with [Gibraltar] as follows:

"(a) that it is understood that all utilities, streets, and other improvements have been placed in the loan security, said lots constituting the loan security being fully developed and ready for the erection of improvements.

"    .    .    ."

Mr. Pine testified as follows:

"Mr. Ballard: Do you know what they are talking about when they say 'developed building lots'?

"Mr. Pine: I know what the developed building lots are.

"Mr. Ballard: Would that be the same as building lots with all the utilities and pavements, curbs, gutters and everything put in?

"Mr. Pine: That's my interpretation."

Mr. Pine testified he did not place the water and sewer pipe lines in the security but did concede that the water and sewer treatment *plants* are part of the security because they became part of the realty of Reserve Tracts G and H. He testified that he did not intend to dedicate the water and sewer lines to public use; we need not decide if a fact issue was raised as to dedication of the lines.

█ As we have noticed, any present or future improvements placed on or in the described property and all appurtenances to the described property were included in the security. It is clear that under the covenant in the $217,655 deed of trust all utilities were considered to be improvements and "have been placed in the loan security." This made the lines part of the security, so Gibraltar obtained title to them through the foreclosure.

There was a part of Glenwood Bayou Subdivision, known as Section 1, which was not included in the loan security, and we are not convinced that the parties specifically provided in the covenants that the water and sewer lines in Section 1 were made part of the loan security.

█ We next consider whether all of the water and sewer lines in Glenwood Bayou Subdivision were appurtenances to Reserve Tracts G and H. Pertaining to real property, an appurtenance "means and includes all rights and interests in other property necessary for the full enjoyment of the property conveyed and which were used as necessary incidents thereto." An appurtenance is also defined as "everything necessary to the beneficial use of the property, . . . whatever is needed to complete a structure and make it capable of performing its intended function." 6 .C.J.S. Appurtenance p. 136.

Szilagy v. Taylor, 63 Ohio App. 105, 25 N.E.2d 360, 361 (1939), states that:

"Things pass as incidents to or appurtenances of realty when they are attached thereto and are essential to its use; in other words, when they are fixtures. Two general tests to be applied in determining whether a particular article is a fixture are, adoption or application to the use or purpose to which that part of the realty to which it is connected is appropriated, and intention to make the article a permanent accession to the freehold."

A Texas court has defined appurtenances in the following manner:

" 'Appurtenance', with reference to realty, has been said to be analogous to 'improvements'; and it has been defined as something annexed to another thing more worthy; that which belongs to something else; and that which belongs to another thing, but which has not belonged to it immemorially. 6 C.J.S. Appurtenance p. 134." Hancox v. Peek, 355 S.W.2d 568, 569 (Tex.Civ.App.1962, writ ref. n.r.e.).

The Supreme Court of California, in Trask v. Moore, 24 Cal.2d 365, 149 P.2d 854 (1944), encountered a problem whose controlling facts were remarkably similar

to those in our case. Ealey owned four lots in an unincorporated area. On this property were located two wells and pumping plants from which there extended a series of pipes furnishing water to some seventy neighboring homes at a monthly rate. Ealey executed to Trask, as security for his promissory note, a deed of trust covering the four lots "together with the rents, issues and profits thereof; also all appurtenances including water rights in which trustor may have an interest, whether represented by stock of any water company or otherwise, benefiting the property herein described."

Although his obligation on the note was still outstanding, Ealey later sold these lots to Mr. and Mrs. Moore and transferred the water distributing system to them by a separate conveyance.

On Ealey's default in payment of his note to Trask, the lots were sold by the trustee under the deed of trust to Trask. Meanwhile the Moores had disconnected the water distributing system from the pumping plants on the four lots and had attached the system to a well and pumps on other land of theirs. Trask sued to have the water lines reconnected to her plants and for other relief. The water lines involved were entirely outside of the four lots described in the deed of trust and consisted largely of pipes and mains placed in the nearby streets and alleys.

The court held that the distributing system involved, although lying outside the land described in the deed of trust, passed to Trask as an appurtenance of the lots purchased at the trustee's sale, stating that the water lines were necessary to the enjoyment of the principal thing, the pumping works, and indispensable in the supply of water to neighboring homes in the tract. "By being so joined and essential to the function of the apparatus as a whole, the distributing system contained and combined in itself all of the elements and attributes of a fixture or appurtenance to real estate."

Mr. Pine built the water plant and sewer treatment plant for the benefit of the entire subdivision, and they enhanced generally the value of the subdivision and specifically the value of Reserve Tracts G and H. The water and sewer pipes were an integral part of the water and sewer system. Mr. Pine testified that their removal would lessen the value of the plants and of Tracts G and H. The pipes are essential to the use of the plants and therefore necessary to the full use and enjoyment of Tracts G and H. Mr. Pine intended the pipes to service the plants located on Reserve Tracts G and H.

"The rule is that in absence of a specific reservation in a deed, buildings and other improvements used in connection with realty in such a way as to constitute appurtenances or fixtures, pass as a matter of course by the conveyance which decrees the title to the realty to the grantee." Milam v. Coleman, 418 S. W.2d 329, 331 (Tex.Civ.App.1967, writ ref. n.r.e.).

We agree with the holding in Trask v. Moore, supra, and hold that the water and sewer lines were appurtenances to Reserve Tracts G and H; this includes the lines in Section 1.

The deed of trust conveyed all improvements and appurtenances to Reserve Tracts G and H and there was no reservation of any water or sewer pipes. When the deeds of trust were foreclosed Gibraltar obtained title to Reserve Tracts G and H, the water and sewer plants, and the water and sewer pipe systems. We do not agree with Mr. Pine's argument that he never placed the pipes in the loan security. The evidence shows that he was an experienced builder who was aware of the meanings of the terms used in deeds of trust; the covenants contained in them show that the parties provided that the security included the pipes. In the absence of a reservation by Mr. Pine the pipes passed to Gibraltar regardless of his statements at the trial. Points of error 1–3 are overruled.

Pine's points of error 4–7 are also overruled. Since Gibraltar obtained title to the pipes, there was no conversion and no damage accruing to Mr. Pine.

Mr. Pine's second major contention is that Gibraltar entered into a contarct, partly oral and partly written, whereby Gibraltar agreed to participate with him in a development program for the Glenwood Bayou Subdivision. In discussing the negotiations for the $217,655 loan Pine stated his conception of the plan as follows:

"Well, if I accepted this Gibraltar commitment and borrowed this money, I had to have, as I have tried to explain to the Court before, some reasonable assurance and good assurance that I had a partner, a financial partner of stature and size such that they could go forward with an ongoing program in the development of this subdivision, because we were accumulating debts of such size that the interest was a very substantial burden on anybody, especially a builder that has to make his living out of building houses, which most of them have to do. So that I wanted assurance that there would be provisions for interim construction of houses, and I needed assurance that once we had the houses up and complete and we could market the houses that we would have reasonable assurance that there would be permanent funds available for qualified borrowers to borrow the money on so we could close them out.

"So then we would have the effect of taking this $217,655 loan, we would go out of that loan with partial releases, we would go into an interim construction loan to build the houses, we would then release those loans and pay those off through the permanent loans that the borrowers would sign up had they bought the homes."

When asked if Mr. Goff of Gibraltar obligated Gibraltar to support such a program, Pine answered:

"Mr. Goff said, 'When you get qualified purchasers of the houses, I will make you permanent loans on these houses.'"

■ Even though we accept Pine's testimony that he and Gibraltar had come to an agreement that Gibraltar would provide the interim and permanent financing, this agreement was too indefinite to be enforceable. Mr. Pine's testimony regarding the interim financing was:

"We had a commitment at one time for 70 percent of loan value, and another time for loan to value of their appraised value, Mr. Godbold, or whoever their appraiser would be.

"...

"Q. Under the agreement that you made with Mr. Goff what was the procedure for you to obtain interim construction financing?

"A. The procedure was to submit a panel of houses, have them appraised, then we would type the notes and deeds of trust, as we in fact did on the four houses, and go right into interim construction. And Mr. Godbold would make the inspection on the houses and help determine the progress payments that we were due over periods of time."

He later testified:

"Q. . . . We have established that these construction loans had to be negotiated each time that they came up, correct?

"A. The terms and conditions had to be negotiated pursuant to the prevailing market rates, . . ."

The agreement described by Mr. Pine may be summarized as one where Gibraltar would lend to him whatever amount of money he needed at any time within three years to construct houses on the 108 lots; these loans were to be made according to "prevailing market rates" and "industry standards." Although the interest rates

probably could have been determined from prevailing market rates, Gibraltar had the right to reject the plans of the houses, there was no agreement as to the total amount to be loaned or when and how the interest was to be paid, when and how the principal was to be paid, the ratio of loan to appraisal value, or when the loans would mature. The record does not disclose the "prevailing market rates" or "industry standards" by which these essential terms of the loan agreement could have been fixed. The agreement to provide interim construction financing was no more than an agreement to agree, and Gibraltar's failure to agree to make these loans did not amount to a breach of contract. Wheeler v. White, 385 S.W.2d 619 (Tex. Civ.App.1964, rev'd on other grounds 398 S.W.2d 93, Tex.); Page & Wirtz Const. Co. v. Van Doran Bri-Tico Co., 432 S.W.2d 731 (Tex.Civ.App.1968, writ ref. n.r.e.); 13 T. J. 2d 258, Contracts § 106.

■ Where an agreement leaves material matters open for future adjustment and agreement, "It is settled law that such a contract is not binding upon the parties to it and therefore it cannot be enforced. O'Neil v. Powell, 470 S.W.2d 775, 779 (Tex.Civ.App.1971, writ ref. n.r.e.); Gasperson v. Madill National Bank, 455 S.W. 2d 381, 387 (Tex.Civ.App.1970, writ ref. n.r.e.). Under the testimony of Mr. Pine, the plans of the houses and their appraised values were matters not yet agreed upon. In addition, the percentage of the appraised value to be loaned was never agreed upon and was subject to change.

Regarding the permanent financing commitment alleged by Mr. Pine, his testimony revealed that the premium charged when the loan was refinanced was subject to change and that Gibralter had the option to turn down loans to the buyers sent by Mr. Pine.

"Q. Since there was no written agreement, the rate of interest, the amount of the loan, the size of the home, the premium to be paid Gibraltar, all of these would have to be agreed upon at a later time?

" . . .

"A. I would say the answer is yes, except with respect to the premium.

" . . .

"It is conceivable that Gibraltar could have changed its premium."

Further, no agreement was reached as to the term of the mortgages to be given to secure permanent financing.

Essential elements of a commitment to provide interim or permanent financing were to be negotiated at a later date or were subject to alteration at a later date. There was no enforceable agreement and therefore no breach of any agreement. Gibraltar fully performed on the three loans upon which it and Mr. Pine reached an agreement. Pine's points of error 8–12 are overruled.

■ Points 13 and 14 are overruled as multifarious since they complain generally of the trial court's refusal to make any of the findings of fact or conclusions of law which Mr. Pine submitted to the court; they direct us to no specific error of the trial court. Rule 418, Texas Rules of Civil Procedure. Further, the trial judge's fact-finding function has not yet been invoked when he grants defendant's motion for judgment upon plaintiff's resting in a non-jury trial. Casey v. Sanborn's, Inc. of Texas, 478 S.W.2d 234, 236 (Tex.Civ.App. 1972, no writ).

We affirm the judgment of the trial court.