CRSS INC., Metcalf & Eddy, Inc., CRSS + Metcalf & Eddy Joint Venture, and Stewart & Stevenson Services, Inc., Appellants,

v.

John RUNION, Appellee.

No. 01–91–00693–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 14, 1995.

Steve Rosenblatt, Richard Redano, Joe C. Holzer, Houston, for Appellant.

John D. Leger, Houston, for Appellee.

Before OLIVER–PARROTT, C.J., and O'CONNOR and WILSON, JJ.

## OPINION

OLIVER–PARROTT, Chief Justice.

This is an appeal from a judgment entered on a jury verdict in favor of the plaintiff, John Runion, and against the defendants, CRSS Inc., Metcalf & Eddy, Inc., the CRSS + Metcalf & Eddy Joint Venture (collectively referred to as the CRSS appellants), and Stewart & Stevenson Services, Inc. (Stewart & Stevenson). The dispute is whether Stewart & Stevenson agreed to enter into a written employment contract with Runion and failed to do so, and whether the CRSS appellants tortiously interfered with this alleged contract. We reverse.

### Facts

The United States Air Force awarded the "Peace Shield Project" to the CRSS + Metcalf & Eddy Joint Venture (the joint venture). The project was the construction of an air defense system in Saudi Arabia. The joint venture subcontracted with Stewart & Stevenson to engineer and construct the primary power generation systems for 17 radar sites in Saudi Arabia.

The joint venture hired John Runion at a base salary of $45,032, starting August 7, 1987, for a term of "not more than one year subject to review as the work progresses." Runion's duties included inspecting and approving Stewart & Stevenson's work.

In July of 1988, Runion and Bob O'Neal, the president and chief operating officer of Stewart & Stevenson, discussed the possibility of Runion working for Stewart & Stevenson. On July 14, 1988, Runion faxed the terms of his employment to

O'Neal. They included a five-year, "no-cut" contract, an annual salary of $85,000, a 12 percent annual salary increase, a 25 percent, nontaxable, annual, completion bonus, reinstatement of accrued employee time from when he had previously worked for Stewart & Stevenson, a company car, credit cards, "key-man" life insurance, a $400 per diem while in Saudi Arabia, an up-front, nontaxable, $50,000 bonus, and a 10,000–share option to purchase stock at $18 per share. On July 19, O'Neal told Runion that the terms were acceptable except for the $50,000 bonus and the stock option, which had to be approved by the board of directors. He said they would "finalize it and get the agreement in writing" after Runion resigned.

On August 1, 1988, Runion tendered a letter of resignation to the joint venture, to be effective August 12, 1988. Runion took a copy of his resignation to Stewart & Stevenson and talked briefly with O'Neal. Runion thought Stewart & Stevenson was preparing a written contract for him. Runion's last day on the job with CRSS was August 12, 1988.

On August 4, the program director of the joint venture met with O'Neal and C. Jim Stewart II, the chairman of Stewart & Stevenson's board of directors. The program director stated that he did not want Runion working for Stewart & Stevenson. Stewart and O'Neal believed that the joint venture would not object to Stewart & Stevenson using Runion as a technical consultant for 90 days. They offered Runion $300 per day, which he accepted. Runion went to work as a technical consultant to Stewart & Stevenson on August 25, 1988.

In February of 1989 a disagreement arose concerning whether Stewart & Stevenson would honor the terms contained in the fax. Stewart & Stevenson terminated Runion on February 20, 1989, after Runion sent a strongly worded memo to O'Neal.

### Petition

On September 18, 1989, Runion sued Stewart & Stevenson, CRSS, Metcalf, and the joint venture. He alleged that Stewart & Stevenson accepted the terms of employment set forth in his fax to them of July 14, 1988, except for the up-front bonus and stock option terms, and promised to formalize in writing these requirements after Runion resigned from the joint venture. Runion claimed that he resigned from the joint venture in reliance on Stewart & Stevenson's representations.

Runion also alleged that the joint venture threatened, intimidated, and harassed Stewart & Stevenson, causing Stewart & Stevenson to refuse to honor its obligation to employ him. Runion claimed that he and Stewart & Stevenson agreed to suspend written formulation and implementation of the employment agreed upon until December 1, 1988; meanwhile, they entered into a substitute employment agreement, which was substantially detrimental to Runion when compared with the initial employment agreement.

Runion alleged that on or about December 1, 1988, Stewart & Stevenson declined to honor its agreement to formalize in writing and to implement the employment agreement, citing as a reason the continuing conduct of the joint venture. Runion complained that Stewart & Stevenson terminated his employment when he continued to complain about its refusal to honor its employment agreement with him.

Runion asserted causes of action against CRSS, Metcalf, and the joint venture based on tortious interference with contractual, business, confidential, and fiduciary relationships, wrongful interference with a prospective contract, and violation of TEX.REV.CIV.STAT.ANN. art. 5196 (Vernon 1987). He asserted causes of action against Stewart & Stevenson based on fraud, promissory estoppel, wrongful termination, breach of contract, quantum meruit, and negligent misrepresentation. He claimed civil conspiracy on the part of all defendants, and sought, jointly and severally from all defendants, actual and puni-

tive damages, attorneys' fees, and pre- and postjudgment interest.

### Jury findings

The jury found that Stewart & Stevenson agreed to sign a written employment agreement with Runion and that Runion relied upon such agreement. The jury also found that Stewart & Stevenson fraudulently induced Runion to accept employment, made negligent misrepresentations to Runion, and failed to comply with the employment agreement with Runion. The jury found that CRSS, Metcalf, and the joint venture discriminated against Runion and tortiously interfered with a contract or prospective contract between Runion and Stewart & Stevenson.

The jury awarded against Stewart & Stevenson $847,000 in actual damages for breach of contract; $200,000 in past and future lost salary and benefits for fraudulent conduct; $20,000 in past and future lost salary and benefits for negligent misrepresentation; and $100,000 in exemplary damages. The jury assessed against CRSS, Metcalf, and the joint venture $150,000 in past and future lost salary and benefits for tortious interference with contract or prospective contract; $177,500 in past and future lost salary and benefits for discrimination; and $50,000 in exemplary damages.

### Judgment

The trial court signed a judgment awarding against all defendants, jointly and severally, $798,721 in actual damages and $83,828 in prejudgment interest on all past damages. Additionally the trial court awarded the following amounts against the following defendants.

*Against Stewart & Stevenson*

1. $200,000 in actual damages

2. $ 23,016 in prejudgment interest on past damages

3. $ 20,000 in actual damages

4. $ 2,301 in prejudgment interest on past damages

5. $100,000 in exemplary damages

6. $ 20,000 in attorneys' fees

*Against CRSS, Metcalf, and the Joint Venture*

1. $150,000 in actual damages

2. $ 11,508 in prejudgment interest on past damages

3. $177,500 in actual damages

4. $ 6,329 in prejudgment interest on past damages

5. $ 50,000 in exemplary damages

### Breach of Contract

■ Both CRSS and Stewart & Stevenson assert points of error contending that the evidence is legally insufficient to support a finding of breach of contract. They contend that there was no contract to breach. We agree.[1]

■ For a contract to be formed, there must be a meeting of the minds of the parties "to the same thing in the same sense at the same time." *South Texas Water Co. v. Bieri,* 247 S.W.2d 268, 270 (Tex.Civ.App.—Galveston 1952, writ ref'd n.r.e.). In other words, an acceptance must be identical with the offer to make a binding contract. *Gilbert v. Pettiette,* 838 S.W.2d 890, 893 (Tex.App.—Houston [1st Dist.] 1992, no writ). The determination of whether there was a meeting of the minds is based upon objective standards of what the party said and did, and not on their alleged subjective states of mind. *Adams v. Petrade Int'l, Inc.,* 754 S.W.2d 696, 717 (Tex.App.—Houston [1st Dist.] 1988, writ denied).

---

1. Although Runion stipulated that the alleged contract that arose from the terms in his fax was unenforceable under the statute of frauds because it was not performable in one year, we address the issue of the existence of a contract because the CRSS appellants may not assert the unenforcibility of the contract as a defense to tortious interference. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 689 (Tex.1989).

■ "Their assent must comprehend the whole proposition, and the agreement must comprise all the terms which they intended to introduce into it." *Bieri,* 247 S.W.2d at 270. "Agreement" is a broader term than the word "contract," and an agreement might lack an essential element of a contract. *Wiley v. Bertelsen,* 770 S.W.2d 878, 882 (Tex.App.—Texarkana 1989, no writ); *see Pine v. Gibraltar Sav. Ass'n,* 519 S.W.2d 238, 243 (Tex.Civ.App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.). Where an agreement leaves material matters open for future negotiation, it is not an enforceable contract. *Pine,* 519 S.W.2d at 244.

The evidence favorable to the verdict follows.

June 1988: O'Neal approached Runion about working for Stewart & Stevenson. July 13, 1988: O'Neal called Runion in Saudi Arabia again inquiring about Runion working for Stewart & Stevenson. Runion asked for an offer. O'Neal declined and asked Runion to send him Runion's requirements for employment. July 14, 1988: Runion sent his requirements to Stewart & Stevenson by fax. July 19, 1988: O'Neal called Runion and stated that he did not "have a problem with anything except" the up-front bonus and stock options. O'Neal needed to know when Runion would resign and stated that the agreement would be finalized and put in writing.

August 1, 1988 Runion visited Stewart & Stevenson in Houston. He had a five-minute meeting with Stewart. Runion reaffirmed that Stewart & Stevenson had his terms and that they would "go forward with this." He told Stewart that O'Neal had asked him when he would resign. Runion told Stewart that he would resign. Stewart told Runion to return after he actually resigned and they would "finalize the issue."

Runion resigned from the joint venture. He returned to Stewart & Stevenson and gave O'Neal a copy of his resignation. Runion stated he had to give the joint venture two weeks notice and might be required to extend that. O'Neal said he hoped not and wanted to "get the thing done." They shook hands and Runion left.

We find no evidence of a contract.

■ First, there is no evidence that O'Neal accepted Runion's offer. O'Neal's alleged acceptance was not identical to Runion's offer. O'Neal did not agree to the up-front bonus and stock option terms. This was, at best, a counteroffer, and there is no evidence that Runion agreed to the omission of these terms.[2] If an acceptance changes the terms of an offer, the offer is rejected. *Gilbert,* 838 S.W.2d at 893.

Second, there is no evidence that all material terms were agreed upon. The $50,000 up-front bonus and the option to purchase 10,000 shares of stock at $18 per share had not been negotiated. This was a significant portion of the compensation demanded by Runion, and there is no evidence that the parties agreed to include it within the terms of the alleged contract, nor is there any evidence that they agreed to exclude it.[3] "A court cannot enforce a contract unless it can determine what it is." *Bendalin v. Delgado,* 406 S.W.2d 897, 899 (Tex.1966) (quoting 1 CORBIN, CONTRACTS § 95 (2nd ed. 1963)) ("to be enforceable, a contract must be sufficiently certain to enable the court to determine the legal obligations of the parties").[4]

---

2. We note, without basing our analysis on it, that Runion testified that he had not accepted employment with Stewart & Stevenson before he resigned from the joint venture. He also testified that neither he nor Stewart & Stevenson wanted a contract in writing while Runion was an employee of the joint venture.

3. According to Runion's testimony O'Neal did not accept the up-front bonus and stock option terms, however, he did not reject them on behalf of Stewart & Stevenson. He merely said the board of directors would have to approve them.

4. Although Runion does not attempt to enforce these terms, it does not prevent them

The evidence viewed in the light most favorable to the verdict only shows that there were two material terms left to be negotiated and the agreement would be finalized and reduced to writing after this negotiation. The rejection of one or both of these terms could have affected negotiation of the other terms. Before the final negotiation could occur, Runion had to resign from the joint venture.

Accordingly, we find no evidence that Runion and Stewart & Stevenson entered into a contract.

We sustain Stewart & Stevenson's points of error one, five, eight, and 11 and the CRSS appellants' points of error numbers six and seven. We also sustain the CRSS appellants' point of error five because there was no contract with which to tortiously interfere.

### Promissory estoppel

 In point of error two, Stewart & Stevenson asserts that there was no evidence of promissory estoppel. Under the doctrine of promissory estoppel a party can recover damages, although technically there is no contract.

> "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

*"Moore" Burger, Inc. v. Phillips Petroleum Co.,* 492 S.W.2d 934, 937 (Tex.1972) (quoting Restatement of Contracts, § 90).

> "[Promissory estoppel] does not create a contract where none existed before, but only prevents a party from insisting upon his strict legal rights when it would be unjust to allow him to enforce them.... The function of the doctrine of promissory estoppel is, under our view, defensive in that it estops a promi-

from being material and essential to the for-

sor from denying the enforceability of the promise."

*Id.* (quoting *Wheeler v. White,* 398 S.W.2d 93, 96 (Tex.1965)). Promissory estoppel is an exception to the statute of frauds. *Nagle v. Nagle,* 633 S.W.2d 796, 799 (Tex. 1982). It may be asserted as an affirmative defense to a statute of frauds defense:

> The restatement expressly recognizes in § 178, comment f, that the doctrine may operate to preclude a defense based on the statute of frauds, in these words:
>
> "Though there has been no satisfaction of the Statute, an estoppel may preclude objection on that ground.... A misrepresentation that there has been such satisfaction if substantial action is taken in reliance on the representation, precludes proof by the party who made the representation that it was false; and a promise to make a memorandum, if similarly relied on, may give rise to an effective promissory estoppel if the Statute would otherwise operate to defraud."

*"Moore Burger,"* 492 S.W.2d at 937.

In *"Moore" Burger,* the supreme court held that a promise to sign a written contract that complies with the statute of frauds estopped the promissor from denying the enforceability of the unsigned, written contract under the statute of frauds. The City of Austin leased a tract of land to "Moore" Burger. The City then decided to sell the tract and notified "Moore" Burger of this intent. "Moore" Burger was interested and began arranging financing.

Dowd and Craus were also interested in purchasing the tract. They approached "Moore" Burger to see if it would lease the tract from them if they bought it. Dowd and Craus proposed that if "Moore" Burger refrained from bidding on the City's tract, they would buy it and an adjoining tract, construct a new building on the adjoining tract, and lease the property to "Moore" Burger for 20 years.

mation of a contract.

Dowd and Craus' attorney drafted a lease. "Moore" Burger took the draft to its attorney, who made some changes. "Moore" Burger then signed the lease and returned it, Dowd and Craus accepted it, and said their trustee would sign it. During these negotiations, Dowd and Craus contracted to sell the property to another party.

The trustee never signed the lease. "Moore" Burger contacted the trustee and stated that it would bid on the tract if he did not sign the lease. The trustee stated that the terms of the lease had been accepted and he would sign it. Based on these promises, "Moore" Burger did not bid on the property. Dowd and Craus purchased the property, the lease was never signed, and they sold both tracts to another party. The court held that "enforcement of the statute of frauds 'would itself plainly amount to a fraud' on 'Moore' Burger's rights," and reversed the summary judgment granted in favor of Dowd and Craus. *Id.* at 938.

The facts in *"Moore" Burger* are distinguishable from those here. *"Moore" Burger* dealt with a promise to sign a finally negotiated, existing, written contract. The case before this Court involves the enforcement of a promise *to prepare* and sign a written contract based on terms orally agreed upon, with at least two other terms to be negotiated.

■ The applicability of promissory estoppel as an exception to the statute of frauds is limited to cases in which a party promised to sign a prepared, written agreement that complies with the statute of frauds. *Beta Drilling, Inc. v. Durkee,* 821 S.W.2d 739, 741 (Tex.App.—Houston [14th Dist.] 1992, writ denied); *Coastal Corp. v. Atlantic Richfield Co.,* 852 S.W.2d 714, 718 (Tex.App.—Corpus Christi 1993, no writ); *Southmark Corp. v. Life Investors, Inc.,* 851 F.2d 763, 768–69 (5th Cir. 1988). A complete agreement on the terms and wording of the written contract is required to permit the application of promissory estoppel to a statute of frauds

defense. *Coastal Corp.,* 852 S.W.2d at 718. A promise to prepare a written agreement is not sufficient. *Durkee,* 821 S.W.2d at 741.

There is no evidence that Stewart & Stevenson agreed to sign an existing, written contract.

We sustain Stewart & Stevenson's second point of error.

## Fraud and negligent misrepresentation

■ In points of error three, four, six, and seven, Stewart & Stevenson asserts that there was no evidence of fraud and negligent misrepresentation and that the trial court erred as a matter of law in rendering judgment in favor of Runion on these causes of action.

The allegations of fraud and negligent misrepresentation include O'Neal's statement that the terms of Runion's fax were accepted, except for the up-front bonus and stock options and that the agreement would be reduced to writing after Runion left the employ of the joint venture. The only actual damages pled were the benefits bestowed by the terms in Runion's fax and the diminishment of past and future wage-earning capacity.

Runion's fraud and negligent misrepresentation allegations seek damages from the breach of the alleged, unenforceable, oral contract. The statute of frauds is a defense to these causes of action:

"Where plaintiff, although casting his complaint in the form of a cause of action for fraud, is attempting to recover damages for the breach of the promise, it is clear that he is, in effect, attempting to enforce the oral agreement. Where, as here, plaintiff is seeking to recover what he would have gained had the promise been performed, i[t] is evident that the gist of his cause of action is the breach of the unenforceable promise. . . . Since plaintiff is here seeking to recover what he would have gained had the promise been performed, it is

apparent that his action, while cast in language sounding in tort, is an indirect attempt to recover for the breach of the unenforceable promise and is, therefore, barred by the statute of frauds."

*Webber v. M.W. Kellogg Co.*, 720 S.W.2d 124, 129 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (quoting *Collins v. McCombs*, 511 S.W.2d 745, 747 (Tex.Civ. App.—San Antonio 1974, writ ref'd n.r.e.)).

We sustain Stewart & Stevenson's points of error three, four, six and seven.

### Discrimination

 In points of error 17 through 20, the joint venture contends that the trial court erred in rendering judgment in favor of Runion on his cause of action for discrimination derived from TEX.REV.CIV.STAT. ANN. art. 5196 (Vernon 1987). It contends that there is no private cause of action under this article.

Article 5196(1) provides as follows:

Either or any of the following acts shall constitute discrimination against persons seeking employment:

1. Where any corporation, or receiver of the same, doing business in this state, or any agent or officer of any such corporation or receiver, shall blacklist, prevent, or attempt to prevent, by word, printing, sign, list or other means, directly or indirectly, any discharged employee, or any employee who may have voluntarily left said corporation's services, from obtaining employment with any other person, company, or corporation, except by truthfully stating in writing, on request of such former employee or other persons to whom such former employee has applied for employment, the reason why such employee was discharged, and why his relationship to such company ceased.

Article 5199, which provides a penalty for violation of article 5196, reads as follows:

Each person, company or corporation, who shall in any manner violate any provision of this chapter shall, for each offense committed, forfeit and pay the sum of one thousand dollars, which may be recovered in the name of the State of Texas, in any county where the offense was committed, or where the offender resides, or in Travis County; and it shall be the duty of the Attorney General, or the district or county attorney under the direction of the Attorney General, to sue for the recovery of the same.

TEX.REV.CIV.STAT.ANN. art. 5199 (Vernon 1987).

Article 5196(1) does not confer a private cause of action. We have found no authority that gives an individual a private cause of action under article 5196(1). The plain wording of article 5196 does not give a private cause of action for damages; the only enforcement mechanism is that set forth in article 5199, which used to be part of article 5196. The article itself leads us to the conclusion that article 5196 does not confer a private cause of action.

We sustain the CRSS appellants' points of error 17 and 19. In light of our rulings above, we need not address the remaining points of error. We reverse and render a take-nothing judgment in favor of the appellants.