**Opinion issued August 30, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00621-CV

———————————

**SUPPLY PRO, INC. AND HARMON K. FINE, INDIVIDUALLY, Appellants**

**V.**

**ECOSORB INTERNATIONAL, INC. D/B/A BIOCEL TECHNOLOGIES, Appellee**

---

**On Appeal from the 11th District Court**
**Harris County, Texas**
**Trial Court Case No. 2012-24524**

---

## MEMORANDUM OPINION

Appellants Supply Pro, Inc. and Harmon K. Fine appeal a final judgment rendered on a jury verdict in favor of appellee Ecosorb International, Inc. d/b/a Biocel Technologies in a breach of contract and fraud case. In five issues, appellants

argue that: (1) there is legally insufficient evidence to support the jury's finding that the parties agreed to include a clawback provision[1] as part of a workout agreement entered into by the parties; (2) alternatively, the trial court erred by refusing to submit appellants' requested jury charge question on fraudulent inducement/equitable estoppel; (3) the evidence is legally insufficient to support the damage awards for storage charges, the clawback provision, and the take-or-pay term; (4) the evidence is legally insufficient to support the awards of punitive damages; and, (5) the trial court erred by not incorporating Biocel's remitittur on prejudgment interest into the judgment.

We modify the trial court's judgment, and affirm, as modified.

### Background

Harmon Fine is the President and owner of Supply Pro, Inc. (Supply Pro). Supply Pro manufactures absorbent floating boom that is used to contain and cleanup offshore oil spills.

After British Petroleum's (BP) Deepwater Horizon oil rig exploded in April 2010, causing a massive oil spill in the Gulf of Mexico, scrap polypropylene, Supply Pro's regular boom-fill material, was in short supply after the spill. As a result,

---

[1] Biocel refers to this provision as the "participation clause." For ease of reference, however, we will adopt appellants' terminology.

Supply Pro and other boom manufacturers had to look for a competitively priced alternative.

Ecosorb International, Inc. d/b/a Biocel Technologies (Biocel), and its parent company, International Cellulose Corporation (ICC), manufacture and sell one such alternative—K-Sorb, a cellulose fiber product that has been chemically treated to make it water repellent. Steve Kempe is the owner of ICC, which manufactures K-Sorb and the other goods that Biocel sells. After the Deepwater Horizon spill, Biocel's product was in demand by companies which manufactured oil containment booms. In May 2010, Supply Pro began purchasing K-Sorb from Biocel to use as a filler in its booms.

In mid-June 2010, BP (through Supply Pro's distributor, Pacific Environmental) requested Supply Pro to produce ten truckloads of boom per day. To achieve that level of production, Supply Pro invested heavily in expanding its facilities and equipment and increased its employees from 50 to 350. By June 29, Supply Pro was expecting to produce and ship five truckloads of boom per day in early July, then ten per day by the middle of July.

On July 11, Biocel emailed Supply Pro that it had "many new customers that are booking more than their needs" and that "due to the extreme production demands created by the oil containment crisis in the Gulf of Mexico, all orders for our

3

hydrophobic materials" would, among other things, be "non-cancellable, 'take or pay.'" Supply Pro did not reply to this email.

On July 13, 2010, Supply Pro submitted blanket purchase order no. 41724 (the July 13 PO) for 31,680 bags (twenty-eight truckloads) of K-Sorb. This PO did not include any terms and conditions besides the product, quantity, price, and net thirty-day payment terms.

On July 16, 2010, Biocel issued order acknowledgment No. 5301 (the July 16 OA) for the July 13 PO which confirmed a purchase price of $14,572.80 for only 1,056 bags (one truckload) of K-Sorb.

BP capped the leaking well on July 15, 2010. Then, on July 23-25, Tropical Storm Bonnie dispersed the remaining oil from the spill. In the late afternoon on July 27, BP instructed Supply Pro to reduce its production from ten truckloads of boom per day to three, but cautioned that circumstances could change quickly as the oil moved or reached land areas.

On July 29, Supply Pro submitted PO no. 41778 (the July 29 PO) to Biocel for the 29,568 bags (twenty-eight truckloads) of K-Sorb that would be needed to meet BP's three-truckload production level. On July 29, Biocel issued an OA (the July 29 OA) for Supply Pro's July 13 PO. This OA also included Biocel's non-cancellation take-or-pay term.

On July 30, BP instructed Supply Pro to stop all boom production, but acknowledged that production could resume at a later time.

On or about August 4, 2010, Supply Pro sent a notice to Biocel stating that it was canceling the remainder of its July 13 PO and all of its July 29 PO. As of that date, Biocel had already produced 6,912 bags of K-Sorb pursuant to these purchase orders.

Fine and Kempe met for lunch on August 11, 2010. Kempe testified in detail about the workout agreement that he and Fine reached at that meeting. According to Kempe, he sent an email to Fine on August 13, 2010 that reflected the terms of their deal.

In his August 13, 2010 email to Fine, Kempe stated: "I am certain we can work together to craft a mutually agreeable resolution." Kempe further stated: "Based on our discussions and some subsequent thinking, we propose the following." He then set forth the terms of the workout which was organized into two parts.

The first part of the email applied if Supply Pro was *not* compensated by Pacific or BP for its cancelled orders. This part contained three sections providing: (1) Supply Pro and Biocel would try to sell the 6,912 bags of K-Sorb over a 6-month period (until February 1, 2011), at which time Supply Pro would purchase any remaining bags; (2) Supply Pro was given the option of (i) paying $12,750

restocking fee in order to immediately return the raw chemical feedstock that Biocel had on hand to Biocel's suppliers or (ii) having Biocel use the feedstock to produce K-Sorb that could be sold or used later, in which case Supply Pro would be invoiced for any bags of K-Sorb remaining as of January 2011; and (3) Biocel would waive remaining purchase requirements under open orders.

The second part, which appellants refer to as the "clawback provision," applied if Supply Pro *was* compensated by Pacific or BP. It contained five sections, which provided, among other things, that: Biocel would be compensated by Supply Pro in the same proportion Supply Pro was compensated for cancelled orders ("less the restocking fee outlined above if the raw material return option is elected by Supply Pro"); "other than the offset for the 12[,]750 restocking fee should Supply Pro elect that option there will be no other offsets to compensate or quantities delivered;" and Supply Pro would notify Biocel in a timely manner in the event of receipt of payments from BP.

After setting forth these alternative scenarios, Kempe stated: "Kindly confirm your acceptance of the above. I also need to hear from you specifically regarding the disposition of the unconverted raw material." Kempe further stated that Biocel is "reviewing several strategies" that Fine and Kempe discussed at lunch "regarding ongoing natural fiber boom sales" and that Biocel will contact Fine the following week to discuss Biocel's ideas.

On August 16, Fine sent Kempe an email, replying to the August 13 email. Fine's email: (1) authorized Biocel to return the raw materials and charge Fine $12,750; and (2) agreed to purchase the balance of the 6,912 bags of K-Sorb remaining after six months. Fine's email did not expressly refer to any of the other proposed terms set forth in Kempe's August 13th email. Kempe replied that same day and informed Fine that the return process was underway.

At trial, Kempe explained that subsections 1-2 of part one, and all of part two, including the clawback provision, were agreed to at lunch. Kempe testified that Fine acknowledged to Kempe during their meeting that Supply Pro was subject to Biocel's take-or-pay terms. Fine claimed "he [Supply Pro] was left holding the bag with all the expenses and the cancellation of what he had in progress." Fine said he did not expect to be paid for cancelled orders. Fine and Kempe concluded the lunch with a handshake:

> We [Fine and I] had an agreement and a handshake at Goode's BBQ. I followed that up—not—I'm not an attorney. I did the best I could preparing that document, summarizing that agreement. There's a lot of detail in that. I sent that to him in case I missed something. He responded to me with the two portions of the agreement that required me to do something, rejected none of the other elements as we had agreed at lunch and we moved on from there; that's correct.

On August 27, Kempe emailed Fine that the raw material return had been completed.

On September 4, after negotiations between BP and Pacific, Supply Pro received a check for $1,592,448 from Pacific, which it contends was intended to

compensate for some of the costs incurred expanding its production facility. Biocel did not learn of this payment until September 2014—over two years after it filed suit against appellants.

On December 1, Fine advised Kempe that Supply Pro still had twenty-one truckloads of boom in its warehouse and $1.7M of feedstock that would probably never be used. None of the remaining 6,912 bags of K-Sorb in Biocel's factory were ever sold, and Supply Pro did not pay for them.

Biocel filed suit against appellants in 2012, and the case was tried to a jury in February 2015. The jury found in Biocel's favor with regard to its breach of contract and fraud claims against appellants. Specifically, the jury found that: (1) Supply Pro and Biocel agreed that the clawback provision proposed in the August 13 email would be part of the "workout agreement," (2) Supply Pro failed to comply with the workout agreement, (3) Biocel and Fine agreed that Fine would personally guaranty the workout agreement, (4) Fine failed to comply with the personal guaranty, and (5) Supply Pro and Fine each committed fraud against Biocel.[2]

---

[2] As it was submitted in the charge, Biocel's fraud claim was based on the allegations that Fine and Supply Pro had fraudulently induced the workout agreement by: (1) entering into it without intending to perform; and (2) misrepresenting that Supply Pro was in a precarious financial position due to the sudden evaporation of its market for boom and that Supply Pro had no expectation of receiving compensation for the cancellation of its boom sales.

The jury also found breach of contract damages for: (a) the price of the 6,912 bales on February 1, 2011 that Biocel was unable to resell at a reasonable price ($95,385.60); (b) commercially reasonable and necessary charges for the custody and care of the goods stored by Biocel ($303,815.65); and (c) Biocel's proportionate share of compensation received by Supply Pro from its distributor for the termination of the boom deliveries ($385,517.00).

With regard to Biocel's fraud damages, the jury found that: (1) the price of the 6,912 bales on February 1, 2011 that Biocel was unable to resell was $95,385.60, (2) commercially reasonable and necessary charges for the custody and care of the goods stored by Biocel were $303,815.65; (3) Biocel's proportionate share of compensation received by Supply Pro from its distributor for the termination of the boom deliveries was $385,517.00, and (4) the unpaid amounts due under the July POs was $480,902.60.

Finally, the jury unanimously found that there was clear and convincing evidence that Supply Pro's and Fine's fraud harmed Biocel, and assessed $800,000 in exemplary damages against Supply Pro and $1,000,000 in exemplary damages against Fine.

On April 21, 2015, pursuant to Biocel's election not to take the contract damages, the trial court entered judgment on the fraud and exemplary damage findings. Specifically, the court rendered judgment in favor of Biocel for: (1)

$783,421.05 in actual damages and $118,266.64 in prejudgment interest against appellees, jointly and severally; (2) $800,000 in exemplary damages against Supply Pro; and (3) $1,000,000 in exemplary damages against Fine.[3] The $783,421.05 in actual damages awarded includes all of the fraud damages that the jury found, except for the $480,902.60 the jury found was due under the July POs.

Appellants filed various timely post-judgment motions. The trial court denied appellants' post-judgment motions on June 29, 2015, but did not rule on, or modify the judgment to reflect, the remittitur that Biocel filed on June 29, 2105 to correct the award of prejudgment interest. This appeal followed.

### Clawback Provision

In their first issue, appellants argue that there is legally insufficient evidence supporting the jury's liability findings relating to the clawback provision.

### A.    Standard of Review

When conducting a legal sufficiency challenge, we view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could do so and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *see Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003) (holding that, in reviewing "no evidence" point, court

---

[3]    The judgment also awarded Biocel $637,455 in attorney's fees through trial and an additional $75,000 in contingent attorney's fees.

views evidence in light that tends to support finding of disputed fact and disregards all evidence and inferences to contrary). To sustain a challenge to the legal sufficiency of the evidence supporting a jury finding, the reviewing court must find that (1) there is a complete lack of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) there is no more than a mere scintilla of evidence to prove a vital fact; or (4) the evidence conclusively established the opposite of a vital fact. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004). "[M]ore than a scintilla of evidence exists if the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). Conversely, evidence that is "so weak as to do no more than create a mere surmise or suspicion" is no more than a scintilla and, thus, no evidence. *Id.* (quoting *Kindred v. Con/Chem., Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

## B. Applicable Law

### 1. Contract Interpretation

In construing a written contract, our primary concern is to ascertain and give effect to the parties' intentions as expressed in the document. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011); *Frost*

*Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005). Contract terms will be given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). If, after applying the pertinent contract construction rules, the contract can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and we will construe the contract as a matter of law. *Frost Nat'l Bank*, 165 S.W.3d at 312.

If a contract is ambiguous, the court should accept parol evidence and can empanel a jury to decide, as an issue of fact, the "true intent of the parties." *Coker v. Coker*, 650 S.W.2d 391, 394–95 (Tex. 1983); *see also Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 315 (Tex. App.—Houston [1st Dist.] 2011, no pet.). While evidence of circumstances can be used to inform the contract text and render it capable of one meaning, extrinsic evidence can only be considered to interpret an ambiguous writing, not to create an ambiguity. *See Kachina Pipeline Co., Inc. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (citations omitted).

### 2. Contract Formation

A plaintiff suing based on a contract must prove the essential elements of a contract, including offer, acceptance, and a meeting of the minds. *See Principal Life Ins. Co. v. Revalen Dev., LLC*, 358 S.W.3d 451, 454–55 (Tex. App.—Dallas 2012, pet. denied). "[T]he offer must be reasonably definite in its terms and must

sufficiently cover the essentials of the proposed transaction that, with an expression of assent, there will be a complete and definite agreement on all essential details." *Id.* at 455; *see also CRSS Inc. v. Runion*, 992 S.W.2d 1, 4 (Tex. App.—Houston [1st Dist.] 1995, writ denied) ("[A]n acceptance must be identical with the offer to make a binding contract"). In other words, "[t]he parties must agree to the same thing, in the same sense, at the same time." *Principal Life Ins. Co.*, 358 S.W.3d at 455. "Whether the parties reached an agreement is a question of fact." *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 72 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). "Whether an agreement is legally enforceable, however, is a question of law." *Id.*

There are certain circumstances in which silence may operate as acceptance. "When an offeree fails to reply to an offer, his silence and inaction operate as an acceptance . . . . [w]here because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept." RESTATEMENT (SECOND) OF CONTRACTS § 69(1) (Am. Law Inst. 1981). Whether silence is acceptance, however, is a question of fact. *See Union Carbide Corp. v. Jones*, No. 01-14-00574-CV, 2016 WL 1237825, at *6 (Tex. App.—Houston [1st Dist.] Mar. 29, 2016, no pet. h.) (mem. op.). An ambiguous acceptance also presents a question of fact for the factfinder. *See Amedisys, Inc. v. Kingwood Home Health*

*Care, LLC*, 437 S.W.3d 507, 517 (Tex. 2014) (citing *Coleman v. Reich*, 417 S.W.3d 488, 493–94 (Tex. App.—Houston [14th Dist.] 2013, no pet.)).

## C.    Analysis

Biocel argues that Fine's September 10, 2013 deposition testimony and Kempe's trial testimony are some evidence that the parties accepted all of the terms set forth in Kempe's August 13 email, including the clawback provision. We can consider extrinsic evidence as part of our sufficiency review if the workout agreement is ambiguous. *See Coker*, 650 S.W.2d at 394–95; *see also Kachina Pipeline Co., Inc.*, 471 S.W.3d at 450 (noting that extrinsic evidence cannot be used to create contractual ambiguity).

Fine's August 16 response expressly references only two parts of Kempe's proposed workout agreement: (1) Biocel's offer of assistance in selling the 6,912 bags of K-Sorb, and (2) Biocel's proposed plan to mitigate some of its losses by returning any unused raw materials to its manufacturer. When he authorized Biocel to return the raw materials, Fine also agreed to pay the associated $12,750 restocking fee. Notably, this restocking fee provision is in both the first section of Kempe's email, and in the clawback provision. Fine's August 16 response does not expressly reject or accept the remaining provisions of the offer, nor does he suggest any modifications to the offer.

14

After reviewing the plain language of the August 13 and August 16 emails, we conclude that Fine's silence in the written documents, with regard to the other terms of Kempe's offer, is susceptible to more than one reasonable interpretation. *See Union Carbide Corp.*, 2016 WL 1237825, at *6 (stating that party's silence may be interpreted as acceptance and if offeree's silence is ambiguous, this creates question of fact). If Fine's silence was intended to indicate that he implicitly accepted all of the terms of Kempe's offer, then the clawback provision is part of the workout agreement. If, however, Fine's silence was intended to indicate that he rejected those other terms, then Fine's reply does not meet the requirements for an acceptance because "an acceptance must be identical with the offer to make a binding contract." *CRSS Inc.*, 992 S.W.2d at 4. We note that because Fine's August 16 email did not attempt to modify the terms of Kempe's offer, his response is not a counteroffer. *See Parker Drilling Co.*, 316 S.W.3d at 74 (stating that purported acceptance that changes or qualifies offer's material terms constitutes rejection and counteroffer rather than acceptance).[4]

Because Fine's silence in the written record creates an ambiguity as to whether he is accepting or rejecting the other terms of Kempe's offer, including the clawback provision, a question of fact is presented with regard to appellants' intent. *See*

---

[4]     We have not found—and the parties have not directed us to—any cases in which a party's express acceptance of some parts of an offer, but silence as to others, constitutes an implicit modification of the offer.

15

*Amedisys, Inc.*, 437 S.W.3d at 517. In light of such ambiguity, the jury was free to consider parol or extrinsic evidence when determining fact questions such as what was the parties' agreement about the clawback provision.

Some of the parol or extrinsic evidence that Biocel relies upon is Fine's September 10, 2013 deposition testimony which seems to indicate that appellants accepted all of the terms set forth in Kempe's August 13 email, including the clawback provision:

> Q.    Okay. And, so, your agreement—you accepted essentially the terms of the work-out deal as contained in the August 13th e-mail; is that fair?
>
> A.    Yes.

Appellants argue that Biocel's reliance upon this statement is misplaced because Fine's testimony relates only to the first section of the workout agreement, and not the clawback provision. While questioning Fine about his August 16 email to Kempe, Fine was asked whether he accepted the terms of the workout agreement "as contained in the August 13th e-mail." It is undisputed that Kempe's August 13th email included the clawback provision. However, the question was not limited to a specific section of the offer and applies to the entire offer, which includes the clawback provision. Further, Fine, who did not testify at trial, did not qualify his answer during his deposition or introduce any evidence that his response was limited to the first half of the workout agreement.

16

In addition to Fine's deposition testimony, Kempe testified at trial about previous dealings with Fine that made it "reasonable that [Fine] should notify [Kempe] if [Fine] d[id] not intend to accept." RESTATEMENT (SECOND) OF CONTRACTS § 69(1). Kempe testified that, at a lunch meeting on August 11, he and Fine discussed and agreed, at least in principle, to all of the terms of the workout agreement set forth in Kempe's August 13 email, including the clawback provision. Kempe testified that, given this oral agreement, Kempe treated Fine's August 16 email as a full acceptance and went forward with the deal by returning the feedstock. Specifically, Kempe testified that Fine "responded to me with the two portions of the agreement that required me to do something, rejected none of the other elements of the agreement as we had agreed at lunch and we moved on from there."

Appellants argue that Kempe's testimony should be excluded from our sufficiency review because it is conclusory and barred by the parol evidence rule. *See City of Emory v. Lusk*, 278 S.W.3d 77, 89 (Tex. App.—Tyler 2009, no pet.) ("A conclusory and nonprobative opinion is legally insufficient to support a jury verdict."). Evidence is legally conclusory if it does nothing more than state a legal conclusion, and it is factually conclusory if it does not provide the underlying facts to support a conclusion. *See Rizkallah v. Conner*, 952 S.W.2d 580, 587–88 (Tex. App.—Houston [1st Dist.] 1997, no writ). Kempe testified at length about each provision of the agreement reached at the August 11 lunch and averred that he and

17

Fine had discussed and agreed to the provisions. Therefore, Kempe's testimony is not conclusory and, as previously discussed, it was not barred by the parol evidence rule.

In light of Fine's deposition testimony, Kempe's trial testimony, and the August 13 and August 16 emails, there is more than a scintilla of evidence to support the jury's finding that Biocel and Supply Pro agreed that the clawback provision would be part of the workout agreement.

We overrule appellants' first issue.

**Fraudulent Inducement**

In their second issue, appellants argue that if the take-or-pay term was part of the parties' original agreements on the July 13 and July 29 purchase orders, then it was arguably induced by fraud and the evidence raised a material fact question on this issue, and the trial court erred by refusing to submit appellants' requested charge question on fraudulent inducement/equitable estoppel. Biocel responds that the workout agreement was a novation, and/or a compromise and settlement agreement, and, therefore, it superseded any defenses to the original purchase agreements.

Novation is the substitution of a new agreement between the same parties or the substitution of a new party with respect to an existing agreement. *New York Party Shuttle, LLC v. Bilello*, 414 S.W.3d 206, 214 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). When a novation occurs, only the new agreement can be enforced. *Id.*

18

"A novation agreement need not be in writing or evidenced by express words of agreement, and an express release is not necessary to effect a discharge of an original obligation by novation." *Bank of N. Am. v. Bluewater Maint., Inc.*, 578 S.W.2d 841, 842 (Tex. Civ. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.). "The intent to accept the new obligation in lieu and in discharge of the old one may be inferred from the facts and circumstances surrounding the transaction [and] the conduct of the parties." *Id.*

The parties do not dispute that the workout agreement is a novation of the original July purchase agreements. Appellants argue, however, that the workout agreement does not foreclose its claim for fraudulent inducement because the workout agreement does not contain an express release of such claims or a disclaimer of reliance. *See, e.g.*, *Italian Cowboy*, 341 S.W.3d at 332 (stating that contract with adequate disclaimer of reliance clause can negate fraudulent inducement claim as matter of law) (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997)). As this court has previously noted, however, "an express release is not necessary to effect a discharge of an original obligation by novation." *Bank of N. Am.*, 578 S.W.2d at 842.

Appellants further contend that the workout agreement, like all other contracts, is subject to avoidance on the ground of fraudulent inducement. The opinions that appellants rely upon for this proposition, however, are distinguishable

because in those cases the parties alleged that the settlement agreement *itself*, not the previous agreement, was the product of fraudulent inducement. *See generally Ford Motor Co. v. Castillo*, 444 S.W.3d 616 (Tex. 2014); *Italian Cowboy*, 341 S.W.3d at 331. On appeal, appellants argue that they were fraudulently induced to accept the take-or-pay provision in the underlying agreements, i.e., the July purchase agreements. They do not argue that they were fraudulently induced to accept the workout agreement, i.e., the novation. We have not found—and appellants have not cited—any Texas cases in which a settlement agreement or novation was set aside because of a claim that the original, or an *underlying* agreement, was the product of fraudulent inducement.

Accordingly, we find appellants' argument unpersuasive. We hold that because the workout agreement constitutes a novation of the original purchase agreements, it superseded all defenses to the original agreements, and therefore, appellants' fraudulent inducement claim is moot.[5]

We overrule appellants' second issue.

---

[5] Biocel further contends that even if appellants' challenges to original purchase agreements were not moot, appellants would still not have been entitled to a jury question on their fraudulent inducement/equitable estoppel claim because they did not present any evidence at trial that anyone from Biocel made any false, material misrepresentations or that appellants actually relied upon these statements.

**Sufficiency of Damages Award**

In their third issue, appellants argue that the evidence is legally insufficient to support the damage awards for the clawback provision, the take-or-pay term, and the storage charges.

**A.    Clawback Provision**

In answer to questions 6c, 7c, and 10, the jury found that Biocel's damages pertaining to the clawback provision were $385,517.00. Appellants argue that because the clawback provision was not part of the workout agreement, it could not have been fraudulently induced or breached, and therefore, the evidence is legally insufficient to support the jury's answers awarding recovery for this element of damage. Because we have determined that there is legally sufficient evidence to support the jury's finding that the parties agreed to include the clawback provision in the workout agreement, we find appellants' argument unpersuasive.

**B.    Take-or-Pay Term**

In answer to questions 7d and 11, the jury found that the unpaid amount due under the July 13 and July 29 POs was $480,902.60. This represents the amount that would have been due for all 34,848 bags that remained undelivered when Supply Pro cancelled the POs. This amount is equal to the sum of the damages the jury found in response to questions 7a ($95,385.60) and 7c ($385,517.00).

Appellants argue that Biocel could not recover the $480,902.60 due under the July POs based on its fraud claim because Biocel alleged fraud only with regard to the workout agreement, not the underlying POs, and that because of the way the jury charge was organized, an award of damages based on 7d and 11 amounts to a double recovery. The trial court's award of $783,421.05 in actual damages, however, equals the sum of the first three categories of fraud damages that the jury found: the price of the 6,912 bags of K-Sorb ($95,385.60), plus storage ($303,815.65), plus Biocel's proportionate share of BP's payment ($385,517.00), minus an agreed credit ($1,297.20). The record does not reflect that the trial court awarded Biocel any damages based on the jury's answers to questions 7d and 11.

## C. Storage Fees

Appellants argue that the evidence is legally insufficient to support the award of $303,815.65 in damages for storage charges because there is no evidence that: (1) the 6,912 bags of K-Sorb should have been stored at all; (2) Biocel incurred any out-of-pocket cost for storing that material; or (3) the storage rate charged by Biocel was commercially reasonable.

### 1. Standard of Review

We measure the sufficiency of the evidence against the submitted charge to determine whether evidence supports both the existence of damages and the amount awarded. *See Regal Fin. Co. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 601 (Tex.

2010). If the terms used in the charge are not defined for the jury, and no objection is made on this issue, we measure sufficiency of the evidence against the commonly understood meanings of such terms. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000).

Evidence is legally insufficient when (a) evidence of a vital fact is completely absent; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810. When conducting our sufficiency review, we consider only the evidence and reasonable inferences supporting the jury's damages finding, and we must disregard any evidence to the contrary, except when such evidence is conclusive. *See id.* at 817, 821.

## 2.    Analysis

Although the jury was asked to find the "commercially reasonable and necessary charges for custody and care of the goods stored by Biocel," the key terms, i.e., "commercially reasonable" and "necessary," were not defined in the charge. Because no objection was made to the lack of definitions, we will review the sufficiency of the evidence based on the charge that was given and give these undefined terms their commonly understood meaning. *See Osterberg*, 12 S.W.3d at 55.

Black's Law Dictionary defines "reasonable" as "[f]air, proper, or moderate under the circumstances" and commerce as involving the exchange of goods and services. BLACK'S LAW DICTIONARY 110, 523 (1996 pocket ed.). The common meaning of "necessary" is "being essential, indispensable, or requisite." *Sw. Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 584 (Tex. 2015) (citing to WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 1161 (1996 ed.)). Thus, the phrase "commercially reasonable and necessary charges" can be commonly understood to refer to charges that are "[f]air, proper, or moderate" in the context of an exchange of goods and services and are "essential, indispensable, or requisite."

The evidence establishes that on December 1, 2010, Kempe emailed Fine that, pursuant to their workout agreement, any of the 6,912 bags of K-Sorb that remained unsold by February 1, 2011, would be invoiced and shipped to Supply Pro. On February 1, Kempe invoiced Supply Pro $95,385.60 for the 6,912 bags. That same day, Fine and Kempe exchanged a series of contentious email messages regarding the remaining materials. In particular, after reminding Fine that Biocel had already "maintained this material on [appellants'] behalf for over 6 months," Kempe stated that any of the 6,912 bags of K-Sorb that were not delivered would accrue storage charges of $0.15 per bag in March, $0.20 per bag in April, and $1.00 per bag thereafter.

When asked at his deposition if he was trying to renege on the workout agreement in early February 2011, Fine testified that he was not, and he claimed that, at that time, he intended to "eventually take the . . . fiber," he just could not take it on February 1st, as the parties had originally agreed. Fine also testified that although Biocel sent him monthly invoices for the storage fees, he never disputed the charges or attempted to store the product elsewhere, or negotiate an alternative storage arrangement with Biocel. Because Fine never paid for or took delivery of the K-Sorb, or directed Biocel to discard or store the product elsewhere, Biocel continued to store the bags in its production plant until the time of trial. The jury awarded Biocel $303,815.65 in damages, which is the full amount of the accumulated storage charges from March 1, 2011 until the time of trial.

In support of the award of storage fees, Kempe testified that Biocel stored Fine's K-Sorb in its manufacturing plant because the company does not have a designated storage facility. According to Kempe, the stored material took up between 3,000-3,500 square feet of space in the plant that would otherwise have been used for productive purposes. Kempe also testified that Biocel had to adjust the manner in which it conducted business in order to accommodate the large volume of K-Sorb being stored in its production facility.

Kempe explained that "the purpose of imposing a storage charge" was "[t]o compensate [Biocel] for the burden of storing and maintaining the material." When

asked if it "cost [Biocel] money to have to take up floor space or truck space to store material for somebody," Kempe responded, "Sure. There's an inconvenience and kind of a non-discrete financial burden on dealing with that issue." Kempe further testified that Fine "didn't have to take delivery [of the K-Sorb]. He could have asked me to store it, which is what he in effect did. I'm storing product that by contract and by our agreement belonged to him as of February 1st, 2011." When asked why the cost of storage increased over time, Kempe explained that it was "[b]ecause of the ongoing burden of us having to manage, handle, store and to try to maintain that in as good of condition as possible."

There is some evidence that appellants agreed to purchase the K-Sorb that Biocel had in its possession on February 1, 2011, and that appellants, not Biocel, owned the bags of K-Sorb as of that date. There is also some evidence that Biocel told appellants that they would be charged a storage fee for any bags still in Biocel's possession beginning on March 1, 2011. There is also evidence that Biocel sent appellants monthly invoices for the accruing storage fees and that appellants never disputed the storage charges or attempted to work out alternative storage arrangements with Biocel.

The jury could reasonably infer from Kempe's testimony that the amount of storage fees charged by Biocel was fair under the circumstances in order to compensate Biocel for the financial burden associated with its management and

26

storage of appellants' product. The jury could also infer that, given their contractual obligation, and Fine's expressed intent to "eventually take the . . . fiber," it was necessary for Biocel to continue to store the K-Sorb until Supply Pro took possession of the product, or instructed Biocel to destroy it or store it elsewhere.

Therefore, although Kempe did not specifically testify that the storage charges were "necessary" or "reasonable," the jury was nevertheless provided sufficient evidence from which it could conclude that the storage charges were essential in order to compensate Biocel for the financial burden of storing appellants' product, unless and until appellants took possession of the product or instructed Biocel how to proceed with their property, e.g., store it elsewhere or discard it. *See generally Ron Craft Chevrolet, Inc. v. Davis*, 836 S.W.2d 672, 677 (Tex. App.—El Paso 1992, writ denied) (stating that witness does not have to speak "magic words," such as "reasonable" and "necessary," to support jury's damages award).

Appellants also argue that the evidence is legally insufficient because there is no evidence that Biocel incurred any out-of-pocket cost for storing the K-Sorb. The jury, however, did not have to find that Biocel incurred any out-of-pocket costs or expenses in order to award storage damages in this case. The jury was simply asked to find the amount of "commercially reasonable and necessary charges for custody and care of the goods stored by Biocel." Business and Commerce Code section 2.710 permits recovery of incidental damages in UCC cases, e.g., "commercially

27

reasonable charges . . . incurred in . . . care and custody of goods after the buyer's breach." TEX. BUS. & COM. CODE ANN. § 2.710 (West 2009). Although the UCC governs the parties' original purchase agreements, it does not apply to the workout agreement, which is not a contract for the sale of goods—it is a settlement agreement and a novation of the original agreements. *See Adams v. Petrade Int'l, Inc.*, 754 S.W.2d 696, 715 (Tex. App.—Houston [1st Dist.] 1988, writ denied). Because the UCC is inapplicable to the workout agreement, the trial court did not err by refusing to include the word "incurred" in this portion of the charge and the UCC cases that appellants rely upon are similarly distinguishable. *See, e.g., Malone v. Carl Kisabeth Co., Inc.*, 726 S.W.2d 188, 191–92 (Tex. App.—Fort Worth 1987, writ ref'd n.r.e.) (reversing and rendering take-nothing judgment in UCC case).

After reviewing the evidence presented to the jury, including Fine's and Kempe's testimony, we hold that there is more than a scintilla of evidence to support the jury's award of damages based on storage fees.

We overrule appellants' third issue.

## Punitive Damages Award

In their fourth issue, appellants argue that the evidence is legally insufficient to support the awards of punitive damages against Supply Pro ($800,000) and Fine ($1,000,000) and that the combined award of $1,800,000 exceeds the statutory damages cap and violates due process. The crux of appellants' arguments is that they

must be treated separately for purposes of assessing liability for fraud (i.e., that Fine's conduct should not be imputed to Supply Pro), but, since Fine is the corporation's lone shareholder, he and the corporation are effectively the same entity, and, therefore, they must be treated as one, solitary defendant for purposes of assessing exemplary damages that are based on the same conduct.

## A.    Standards of Review

When reviewing the legal sufficiency of the evidence to support an award of punitive damages, i.e., exemplary damages, an appellate court must be mindful of the burden of proof governing the determinations of the factfinder. *See Finley v. P.G.*, 428 S.W.3d 229, 238 (Tex. App.—Houston [1st Dist.] 2014, no pet.). An elevated burden of proof at trial requires a higher standard of review on appeal. *City of Keller*, 168 S.W.3d at 817 (citation omitted). An award of exemplary damages under Texas law requires the claimant to meet an elevated burden of proof, i.e., clear and convincing evidence. *See Finley*, 428 S.W.3d at 238. Clear and convincing evidence means the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations." *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). The constitutionality of exemplary damages is a legal question, which we review de novo. *Tony Gullo*, 212 S.W.3d at 307.

**B. Applicable Law**

Under Chapter 41 of the Texas Civil Practice and Remedies Code, a claimant may be awarded exemplary damages if it can prove by clear and convincing evidence that it was harmed as a result of the other party's fraud. TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a)(1), (b) (West 2015). In addition to authorizing awards of exemplary damages in suits for fraud, Chapter 41 also sets forth the factors that courts must consider when assessing such damages and it limits the amount and scope of an individual defendant's liability for exemplary damages.

Specifically, in assessing exemplary damages, the factfinder must consider: (1) the nature of the wrong; (2) the character of the conduct at issue; (3) "the degree of culpability of the wrongdoer"; (4) the situation and the parties' sensibilities; (5) the extent to which such conduct offends a public sense of justice and propriety; and (6) the defendant's net worth. *Id.* § 41.011(a) (West 2015). In multi-defendant cases, "an award of exemplary damages must be specific to a defendant, and each defendant is liable only for the amount of the award made against that defendant." *Id.* § 41.006 (West 2015).

Chapter 41 also caps the maximum amount of damages that may be awarded against an individual defendant in a given case. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.002(b) (West 2015). Pursuant to section 41.008:

> Exemplary damages awarded against a defendant may not exceed an amount equal to the greater of:

(1)(A) two times the amount of economic damages; plus

(B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or

(2) $200,000.

TEX. CIV. PRAC. & REM. CODE § 41.008(b) (West 2015). The parties do not dispute that the exemplary damages cap applies in this case.

In addition to this statutory cap, there are also due process limits against grossly excessive or arbitrary exemplary damage awards. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417–18, 123 S. Ct. 1513, 1520–21 (2003). The prevailing principle is that a "grossly excessive" award of exemplary damages offends due process because it "furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Id.* at 417, 123 S. Ct. at 1520. In conducting a due process review, courts must consider: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio between actual and exemplary damages; and (3) the size of civil penalties in similar cases. *Id.* at 418, 123 S. Ct. at 1520. Although there are no bright-line rules, there is a long history of penalties in the double, treble, and quadruple range, and awards in the single-digit range are more likely to comport with due process. *Id.* at 425–26, 123 S. Ct. at 1524.

## C. Sufficiency of the Evidence

Appellants argue that the evidence is legally insufficient to support the jury's award of exemplary damages against Supply Pro based on fraud because the

31

evidence is legally insufficient to prove that Supply Pro committed fraud independently from Fine. Biocel responds that the evidence is sufficient to support the jury's award against Supply Pro because the evidence conclusively establishes that Fine is a vice principal of Supply Pro, and therefore, Fine's tortious conduct can be imputed to Supply Pro as a matter of law. *See Bennett v. Reynolds*, 315 S.W.3d 867, 884 (Tex. 2010).

In its live pleading at trial, Biocel alleged that appellants engaged in fraud when Supply Pro entered into the workout agreement with no intention to perform under the contact, and when Supply Pro misrepresented to Biocel that Supply Pro was in a precarious financial position after the spill and had no hope of receiving compensation for BP's cancelled orders.

Question 5 asked the jury: "Did Supply Pro or Harmon Fine commit fraud against Biocel?" The jury answered, "yes," to both Supply Pro and Fine. When asked whether there was clear and convincing evidence that Biocel was harmed by the fraud of Supply Pro or Fine in Question 8, the jury unanimously answered "yes," to both Supply Pro and Fine. Notably, the jury was never asked whether Supply Pro committed fraud against Biocel *independently* from Fine.[6] Appellants did not object

---

[6] The jury was also never instructed that Supply Pro was responsible for Fine's acts and omissions, or that Fine's fraud could be attributed to Supply Pro, but only if the jury found that Fine was Supply Pro's vice-principal. *See generally GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 618 (Tex. 1999) (holding corporation may be liable for torts of its vice-principals and stating that individual's "status as a vice-principal of

to the charge on this basis and they are not challenging the charge on appeal. Accordingly, we will assess the sufficiency of the evidence based on the charge that was actually submitted to the jury. *See Osterberg*, 12 S.W.3d at 55.

It is well established that corporations, like Supply Pro, can "only act through individuals." *Tri v. J.T.T.*, 162 S.W.3d 552, 562 (Tex. 2005). A vice-principal is an individual who represents the corporation in its corporate capacity, and "'includes persons who have authority to employ, direct, and discharge servants of the master, and those to whom a master has confided the management of the whole or a department or division of his business.'" *See Bennett*, 315 S.W.3d at 884 (quoting *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 618 (Tex. 1999)). The acts of a vice-principal are deemed to be acts of the corporation for purposes of exemplary damages because the vice-principal "represents the corporation in its corporate capacity." *Bennett*, 315 S.W.3d at 883 (quoting *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391–92 (Tex. 1997)). A corporation's officers are considered corporate vice-principals. *See Bennett*, 315 S.W.3d at 884.

Further, a corporation and its corporate officer can both be liable for exemplary damages based on the *same misconduct*. *See Bennett*, 315 S.W.3d at 884–

---

the corporation is sufficient to impute liability to [the corporation] with regard to his actions taken in the workplace"); *cf. Steel v. Wheeler*, 993 S.W.2d 376, 381 (Tex. App.—Tyler 1999, pet. denied) (holding failure to submit question and instruction harmless because evidence on point was conclusive).

85. In *Bennett*, the Texas Supreme Court held that both the corporation and its president were subject to exemplary damages based on the president's stealing of cattle, because the president, Bennett, was a corporate vice-principal who was acting in his corporate capacity when he stole the cattle. *Id*. Specifically, the court stated that based on Bennett's status as the corporation's "highest corporate officer, the president," and Bennett's testimony that he "[runs] the ranch" and made the decisions for the corporation, "not only was Bennett indisputably a vice-principal of [the c]orporation, he was most likely the only vice-principal and the only person whose conduct and decisions could subject the corporation to exemplary damages." *Id.* at 884.

Appellants argue that *Bennett* is distinguishable because section 41.008's cap did not apply in that case. *See* TEX. CIV. PRAC. & REM. CODE § 41.008(c)(13) (West 2015) (setting forth felony theft exception to statutory cap). The applicability of the damages cap, however, has no bearing with respect to *whether* a corporation and its corporate officer can both be liable for exemplary damages based on the same misconduct.

Appellants further note that in addressing whether the corporation (as well as its president, Bennett) could be independently liable for punitive damages, the court did not confine its analysis to the fact that Bennett was a vice-principal of the corporation. *See Bennett*, 315 S.W.3d at 884–85. The court also focused on whether

Bennett had used his corporate authority over corporate employees, on corporate land, to convert cattle using corporate equipment. *See id*. at 884–85. Those facts, however, go to whether Bennett was acting in his capacity as a corporate vice-principal and are not independent grounds for imputing a corporate officer's conduct to its corporation. *See GTE Sw., Inc.*, 998 S.W.2d at 618 (defining corporate vice-principals to include "persons who have authority to employ, direct, and discharge servants of the master, and those to whom a master has confided the management of the whole or a department or division of his business").

In this case, the evidence conclusively establishes that Fine, Supply Pro's owner and President, is a corporate officer of Supply Pro, and, therefore, a vice-principal of the corporation.[7] *See Bennett*, 315 S.W.3d at 884 (defining vice-principals as, inter alia, corporate officers) (citation omitted). As Supply Pro's vice-principal, Fine's actions are "deemed to be the acts of the corporation itself." *GTE Sw., Inc.*, 998 S.W.2d at 618. Notably, appellants are not challenging the sufficiency of the evidence supporting the jury's finding that Fine committed fraud against Biocel. Because the evidence conclusively establishes that Fine is Supply

---

[7] A corporation, however, cannot be liable for its vice-principal's actions "if the vice-principal's misconduct occurred while he was acting in a personal capacity unrelated to his authority as a corporate vice-principal." *Bennett v. Reynolds*, 315 S.W.3d 867, 884–85 (Tex. 2010). There is ample evidence that Fine was acting in his corporate capacity when he negotiated and entered into the workout agreement on behalf of Supply Pro after he canceled the purchase orders that Supply Pro had previously placed with Biocel.

Pro's corporate vice-principal, and therefore, his conduct can be imputed to Supply Pro as a matter of law, we hold that there is legally sufficient evidence that Supply Pro committed fraud against Biocel. *See Bennett*, 315 S.W.3d at 883–84.

**D.      Statutory Cap and Excessiveness of Exemplary Damages Award**

Appellants also argue that Fine and Supply Pro must be treated as one defendant for purposes of assessing exemplary damages because Fine and Supply Pro are effectively the same entity, and that the combined $1.8 million award of exemplary damages, based solely on the conduct of Fine, exceeds section 41.008's cap on the amount of exemplary damages that may be awarded based on the conduct of one defendant. Appellants further contend that the combined award of $1.8 million in exemplary damages is excessive in light of the fact that the alleged fraud did not cause physical harm, threaten safety, or cause or threaten financial ruin. *See State Farm*, 538 U.S. at 419, 123 S. Ct. at 1521 (identifying factors courts consider when assessing reprehensibility of defendant's conduct for purposes of evaluating constitutionality of exemplary damages award) (citation omitted).

Specifically, appellants argue that refusing to treat them as a single defendant for purposes of assessing exemplary damages "defeats the purpose of Chapter 41 to limit, rather than increase, damages." The plain language of Chapter 41, however, indicates that it is intended to limit the amount of damages recoverable against an individual defendant in a given legal proceeding, not a group of defendants. *See* TEX.

CIV. PRAC. & REM. CODE §§ 41.006 (prohibiting joint and several liability for exemplary damages and stating that "each defendant is liable only for the amount of the award made against that defendant"), 41.008(b) (limiting amount of exemplary damages recoverable from "a defendant"), and 41.011(a)(3), (6) (stating that factfinder must consider, inter alia, "the degree of culpability of the wrongdoer" and "the net worth of the defendant" when determining amount of exemplary damages to award). Supply Pro and Fine, its owner, president, and corporate vice-principal, are both named defendants in the underlying suit.

Appellants also suggest that it is a violation of due process when the vice-principal doctrine allows a corporation and a vice-principal like Fine who is also the corporation's sole shareholder, to both be subject to exemplary damages for the same conduct. Citing to *Owens-Corning Fiberglas Corp.*, appellants argue that the award of punitive damages against Supply Pro and Fine "amounts to a multiple award of punitive damages for the same conduct by a single person." *See Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 48 (Tex. 1998). In that case, the court recognized that "repeatedly imposing punitive damages on the *same defendant* for the same course of wrongful conduct may implicate substantive due process constraints." 972 S.W.2d at 50 (emphasis added). *Owens-Corning Fiberglas Corp.*, however, is distinguishable on its facts because, unlike here, that case involved one defendant who was being subjected to multiple punitive damage

awards in different legal proceedings that were brought by different plaintiffs based on the defendant's exact same conduct, i.e., manufacturing and distributing asbestos-containing products. The exemplary damages awarded in this case were awarded against *different* defendants, Supply Pro and Fine.

We have not found any authority requiring courts to treat a corporation and its vice-principal as a single defendant. It is well established that a corporation is a separate legal entity from its shareholders, officers, and directors. *Singh v. Duane Morris, L.L.P.*, 338 S.W.3d 176, 181–82 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (citing *Sparks v. Booth*, 232 S.W.3d 853, 868 (Tex. App.—Dallas 2007, no pet.)). "A bedrock principle of corporate law is that an individual can incorporate a business and thereby normally shield himself from personal liability for the corporation's contractual obligations." *Singh*, 338 S.W.3d at 182 (citing *Sparks*, 232 S.W.3d at 868). An entity's corporate status, however, cannot be used as both a sword and a shield, i.e., used when it benefits the shareholders, only to be disregarded when it is advantageous for the shareholders or corporate organizers to do so. *See Singh*, 338 S.W.3d at 182 (citations omitted). That is essentially what appellants are asking this court to do—to disregard Supply Pro's corporate status in order to limit the total amount of exemplary damages recoverable in this case from the two named defendants.

Accordingly, we find appellants' argument that they should be treated as one defendant for purposes of assessing exemplary damages to be unpersuasive.

In light of our resolution of this issue, we need not address appellants' argument that the combined award of $1.8 million in exemplary damages against one defendant violates due process.

We overrule appellants' fourth issue.

## Remitittur on Prejudgment Interest

In their fifth issue, appellants argue that the trial court erred by not incorporating Biocel's remitittur on prejudgment interest into the judgment. Although Biocel filed a remittitur with the trial court reflecting that prejudgment interest should have been $116,779.82 rather than the $118,266.64, the trial court's judgment awarded Biocel $118,266.64 in prejudgment interest. Biocel does not dispute on appeal that $116,779.82 is the amount of prejudgment interest that should have been awarded in this case. Accordingly, we sustain appellants' fifth issue and modify the judgment to award Biocel $116,779.82 in prejudgment interest. *See* TEX. R. APP. 43.2(b).[8]

---

[8]    In light of our resolution of this case, we need not consider Biocel's counter-issue.

## Conclusion

We modify the trial court's judgment, and affirm, as modified.


Russell Lloyd
Justice

Panel consists of Chief Justice Radack and Justices Jennings, and Lloyd.